**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Glen HERMAN, Defendant-Appellant.**

**No. 77–5455.**

United States Court of Appeals, Fifth Circuit.

July 21, 1978.

---

See also 5 Cir., 544 F.2d 791.

J. Cheney Mason, Orlando, Fla. (Court-appointed), for defendant-appellant.

John L. Briggs, U. S. Atty., Jacksonville, Fla., Mark L. Horwitz, Asst. U. S. Atty., Orlando, Fla., for plaintiff-appellee.

Before WISDOM, TJOFLAT, and VANCE, Circuit Judges.

WISDOM, Circuit Judge:

Glen Herman appeals from his convictions for aggravated robbery of the Gotha, Florida, Post Office, and first degree murder of its postmistress, Mrs. Marion Loraine Smith.[1] Herman alleges that the government's evidence was insufficient to convict him of either crime. He also contends that the government, primarily by bringing an interlocutory appeal, denied him the speedy trial that the Sixth Amendment guarantees. We find no merit in Herman's contentions, and we affirm his convictions.

## I.

Thomas Brunson, who pleaded guilty to charges arising out of the slaying and robbery at Gotha, supplied a substantial part of the government's case against Herman at trial. Brunson testified that he saw Herman driving an old model, light-colored Cadillac in Winter Garden, Florida, on July 21, 1975. Brunson joined Herman in the car, and the two traveled to Gotha. Once in Gotha, Brunson and Herman drove around the town. As they first passed the Post Office, Herman said to Brunson "What about this?"

After driving around Gotha for some time, Herman stopped his car beside the Post Office. He asked Brunson to find out how many people were inside. Brunson went in and asked for stamps. He observed a young lady enter, check her postal box, and leave. Before Brunson left the Post Office, Herman entered and bolted over the counter. Then Herman, with a pistol in his hand, walked toward Mrs. Smith, the postmistress, and ordered her to the back of the Post Office, where the safe was. When Herman and Mrs. Smith had been in the back of the building for two or three seconds, Brunson heard a shot and saw Mrs. Smith fall. Brunson then left the Post Office followed by Herman. The two entered Herman's car and drove away, heading for Winter Garden.

Herman soon turned around, however, saying that he had left his pistol at the Post Office. He entered the building and came out after a short time. Herman then drove to Winter Garden and let Brunson out of the Cadillac.

The government's case was not limited to Brunson's testimony. Several witnesses testified that they saw a light-colored Cadillac with two black males in Gotha on the day of the shooting. One witness, Miss Paula Margaret Harrison, saw a black man enter the Post Office, and stand near the mail boxes. Another witness, Mrs. Marion Bush, who lived across the street from the Post Office, testified that she heard a shot on the afternoon of the slaying. She looked out her window and saw two black men leave the Post Office and drive away in a light-colored Cadillac. Mrs. Bush crossed the street to the Post Office and saw Mrs. Smith's body on the floor. Mrs. Bush then returned home and telephoned the Orange County Sheriff's Office.

The Sheriff's men found four fingerprints on the Post Office counter. These fingerprints belonged to Brunson and Herman. The government also showed to the jury plaster cast impressions and photographs of tire prints that matched Herman's tires. These prints came from a clay road near the Post Office where Herman allegedly turned his car around to retrieve his pistol.

The government put on other evidence tending to show that Herman robbed the

---

1. Robbery of a Post Office violates 18 U.S.C. § 2114; murder of a postal employee violates *id.* § 1114. Herman was sentenced to life imprisonment on the murder count, which was made first-degree by the felony-murder rule, *id.*

§ 1111. *See* note 2. He received a twenty-five year sentence for the robbery; this sentence is to run consecutively, after the murder sentence.

Post Office. Mrs. June M. Carmichael testified that she bought three postal money orders from Mrs. Smith at about 2:30 on the afternoon of the slaying. Mrs. Carmichael paid for the money orders with a one hundred dollar bill and a ten dollar bill; she spent about twenty minutes transacting business. The sheriff's officers arrived about an hour after Mrs. Carmichael entered the Post Office. The officers found the Post Office safe open near Mrs. Smith's body. At the service counter, they found Mrs. Smith's cash drawer open and empty of currency. A thorough search of the Post Office revealed neither a one hundred dollar bill nor the postal copies of Mrs. Carmichael's three money orders. A coworker's cash drawer, securely locked into the safe, had not been disturbed.

An audit of the Post Office just after the slaying revealed a shortage of $288.70 in value. The shortage had developed at some time during the three weeks before the audit.

Herman was arrested on July 31, 1975, ten days after the crime. He was indicted August 4, 1975, and re-indicted August 27. Herman entered a guilty plea on November 10, but moved to withdraw the plea on November 24, and obtained court approval to withdraw it on December 8, 1975. The district judge then set trial for January 12, 1976.

On January 7, 1976, the district court completed its consideration of Herman's suppression motion. It granted the motion in part. The government sought a continuance of the trial date from January 12 until January 22, 1976, so that it could consider appealing the suppression order. Herman opposed the continuance, but sought a delay until February if any continuance were granted. The district court accordingly set February 17, 1976, as the new trial date.

Meanwhile, on January 29, 1976, the government appealed the district court's suppression order to this Court. The order was appealable under 18 U.S.C. § 3731, which allows the government to take interlocutory appeals of suppression orders in certain circumstances. The trial court stayed proceedings pending that appeal. This Court affirmed in an opinion on January 3, 1977. *United States v. Herman,* 5 Cir. 1977, 544 F.2d 791. The government sought rehearing and considered petitioning the United States Supreme Court for certiorari. The government abandoned plans to seek Supreme Court review, however, and this Court issued its mandate on May 9, 1977. Herman's trial began June 20, 1977, twenty-two months and 20 days after his arrest.

On September 16, 1976, Herman, who was incarcerated from the time of his arrest, wrote the district court asking to be tried. He alleged pro se that he was being denied a speedy trial. At a hearing, however, Herman's attorney stated that he did not desire to argue that motion and that the delay was beneficial to the defense. The attorney later changed his mind and on March 3, 1977, sought dismissal of the case on the ground that the government had denied Herman a speedy trial.

## II.

■ We consider first Herman's contentions that the evidence produced at trial was insufficient to convict him of robbery and of first degree murder. The evidence is clearly sufficient to show that Herman killed Mrs. Smith: Brunson saw him direct Mrs. Smith to the back of the Post Office with a gun in his hand; Brunson heard a shot and saw Mrs. Smith fall.

Herman's contention that there was insufficient evidence to convict him of robbery cannot be disposed of as patently without merit. And if the robbery count cannot stand, neither can the first-degree murder conviction. The degree of the murder conviction arises from the felony-murder rule.[2] 18 U.S.C. § 1111(a).

---

**2.** The English common law provided that one who caused another's death while committing or attempting to commit a felony was guilty of murder even though he did not intend to kill the deceased. LaFave & Scott, *Criminal Law* § 71 at 545. The federal murder statute limits the application of the rule to four felonies: arson, rape, burglary, and robbery. 18 U.S.C.

In determining the sufficiency of the evidence, we must view the record in the light most favorable to the government. *Glasser v. United States,* 1942, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680. The government's case against Herman is circumstantial. The circumstantial nature of the government's case does not affect our task in reviewing the sufficiency of the evidence: "our task is to determine whether reasonable minds could conclude that the evidence is inconsistent with the hypothesis of the accused's innocence". *United States v. Warner,* 5 Cir. 1971, 441 F.2d 821, 825, *cert. denied* 1971, 404 U.S. 829, 92 S.Ct. 65, 30 L.Ed.2d 58. *See also United States v. Prince,* 5 Cir. 1975, 515 F.2d 564. Despite Herman's assertion, we find that there was sufficient evidence for the jury to find him guilty of robbery and thus of first-degree murder.

The jury could infer that Mrs. Smith, the sole postal employee on duty, would not operate the Post Office with a cash drawer devoid of currency. Mrs. Carmichael's testimony that she gave Mrs. Smith $110 in cash within the hour of the slaying supports the inference that the drawer had not been empty of cash when Herman entered. The jury could thus infer that someone had taken the drawer's contents, including the three postal money order receipts from Mrs. Carmichael's purchase and whatever currency had been in the drawer. The post-slaying audit, which showed that $288.70 in value had disappeared during the preceding three weeks, further supports the inference that someone had taken the drawer's cash.

Herman's actions in Gotha justify and even require the inference that he was the person who took the currency. His driving around the town and asking "What about this?" as he passed the Post Office would seem innocent activity absent the later slaying. But, in context, the jury could construe this activity as the selection of a place to commit robbery. Herman's action in sending Brunson into the Post Office to count heads seems explainable only as part of a criminal plan. Finally, of course, Herman's access to the cash drawer and his slaying of Mrs. Smith support the inference that he committed robbery. Given all this evidence, the jury could conclude beyond a reasonable doubt that Herman robbed the Gotha Post Office.

We must discuss one further assertion of the defense. Eighteen U.S.C. § 1111 specifies that a slaying is murder in the first degree if committed "in the perpetration of" certain crimes, including robbery. Herman says that even if he committed robbery and murder, the murder did not necessarily occur during the robbery. He argues that he could have bolted the counter and shot Mrs. Smith without having the robbery in mind. After this purposeless slaying, so he says, he could have then thought of committing the robbery. This attenuated hypothesis is perhaps consistent with innocence, but it is so implausible that reasonable minds must reject it. *Cf. United States v. Marable,* 5 Cir. 1978, 574 F.2d 224, 229; *United States v. Warner,* 5 Cir. 1971, 441 F.2d 821, 825, *cert. denied* 1971, 404 U.S. 829, 92 S.Ct. 65, 30 L.Ed.2d 58.

### III.

To determine whether Herman had the speedy trial required by the Sixth Amendment to the Constitution,[3] we use a balancing process described in *Barker v. Wingo,* 1972, 407 U.S. 514, 92 S.Ct. 2182, 33

---

§ 1111(a). *See generally* LaFave & Scott, *Criminal Law* § 71 at 545–61. The federal statute makes slayings that occur while committing or attempting to commit these four felonies murder in the first degree. 18 U.S.C. § 1111(a).

3. Herman does not contend that the Speedy Trial Act, 18 U.S.C. § 3161 *et seq.,* applies to this case. Section 3161(i) provides that time begins running anew when the trial court accepts a defendant's withdrawal of a guilty plea. Section 3161(h)(1)(D) provides that delays arising out of interlocutory appeals are not to be included in computing the time within which trial must take place. For persons (like Herman) indicted and arraigned between July 1, 1975 and June 30, 1976, the government had 180 days from arraignment to proceed to trial. 18 U.S.C. § 3161(g). The government complied with the statute's requirements. Compliance with the Speedy Trial Act does not work as a bar to a Sixth Amendment claim, however. 18 U.S.C. § 3173.

L.Ed.2d 101. *Barker* requires us to consider at least these four factors: the length of time that the defendant waited for trial, the validity of the government's reasons for the delay, the timeliness and strength of the defendant's assertions of his right, and the prejudice accruing to the defendant from the delay. We conclude that the government tried Herman promptly enough, and that the "unsatisfactorily severe remedy of dismissal" is not appropriate in this case. *Id.* at 522.

## A.

### The length of the delay

The first factor, the length of the delay, serves two roles. First, it serves a threshold role: there must be a delay long enough to be "presumptively prejudicial". *Barker v. Wingo,* 407 U.S. at 530, 92 S.Ct. 2182, 33 L.Ed.2d at 117. Here, a twenty-two month and twenty day delay[4] for a relatively simple charge is presumptively prejudicial and serves as a "triggering mechanism" to invoke further analysis. *Id.* See *United States v. Pitts,* 5 Cir. 1978, 569 F.2d 343, 347 (two and one-half year delay); *United States v. Netterville,* 5 Cir. 1977, 553 F.2d 903, 913–14 (nineteen month and two week delay). Second, we must weigh the length of this delay along with the other factors we consider. *United States v. Netterville,* 5 Cir. 1977, 553 F.2d 903, 914.

## B.

### The reasons for the delay

Herman, on appeal, seeks to emphasize the second factor, the reasons for the delay. Of course, Herman, rather than the government, is responsible for some of the delay. His guilty plea and its subsequent withdrawal delayed the trial and cannot be charged in this case to the government.[5]

The balance of the delay, eighteen months and twelve days, is attributable to the government. Some of this delay arose from the acceptable practice of scheduling trials some time before they begin. Most of the delay, however—from January 12, 1976, to May 9, 1977, nearly fifteen months—resulted from the government's decision to consider and seek an interlocutory appeal.

The question of the propriety of a delay caused by an interlocutory appeal is apparently one of first impression in this Circuit. Other courts have considered this question, however.

In *United States v. Bishton,* 1972, 150 U.S.App.D.C. 51, 463 F.2d 887 (per curiam), the Court of Appeals considered the propriety of a delay resulting from an appeal by the government. The government, by information, first charged Bishton in the local court with violating 22 D.C.Code § 702, which bars receiving money for any promotion in office obtained "from the Commissioners of the District of Columbia, or from any officer under them". The local court dismissed the case because the reorganization of the District had abolished the Commissioners before the time of the alleged crime. The government appealed that dis-

---

**4.** The government urges us to charge the time between arrest and Herman's withdrawal of his guilty plea to Herman. This procedure is mandated for cases arising under the Speedy Trial Act, 18 U.S.C. § 3161(i). We are not sure, however, that artificially shortening the length of the delay would be appropriate in every case arising under the constitutional guarantee. *See* note 5. The analysis mandated by *Barker v. Wingo* allows us to examine the reasons for the delay and to excuse any delay that the defendant himself causes. This *Barker* analysis is sufficient in this case.

**5.** Although Herman is chargeable with the delay attributable to his plea, all withdrawn guilty pleas might not be chargeable to the defense.

Long delays in bringing a case to trial might cause an incarcerated defendant to accept a plea bargain that he later reconsiders. We are not faced with such a situation here. The government urges that Herman be charged with the period from arrest on July 31 until the district court's order of December 8, 1975, that permitted Herman to withdraw his plea. This approach seems reasonable to us in this case because the defense concedes that this delay "result[ed] from requests and/or acquiescence by the defense". Brief for Appellant at 11. *Cf.* 18 U.S.C. § 3161(i), which provides that when the court permits the withdrawal of a plea, time begins running anew for the purpose of the Speedy Trial Act.

missal, but lost its appeal. It then prosecuted Bishton for the same offense under a federal statute.

Bishton appealed his federal conviction. He contended that the government's appeal worked to deny him a speedy trial. The Court affirmed his conviction. The Court held that the government's decision to appeal the local court's dismissal rather than to proceed immediately under the federal statute was not "arbitrary, negligent, or purposefully oppressive". 150 U.S.App.D.C. at 54, 463 F.2d at 890. The Court found that the government presented a difficult issue in its first appeal, a "highly technical" issue the resolution of which was unforeseeable. *Id.* 150 U.S.App.D.C. at 55, 463 F.2d at 891. The Court found no violation of Bishton's right to a speedy trial. It found that "the time spent on appeals is not generally included for purposes of calculating the period of delay in prosecutions. The right of the Government to appeal decisions in the defendant's favor before jeopardy attaches is designed to protect the interests of society in lawfully prosecuting criminal offenders". *Id.* 150 U.S.App.D.C. at 54, 463 F.2d at 890.

The Court did "not intimate that the delay caused by the Government may never constitute denial of a defendant's right to speedy trial. Whenever the Government's action at any stage of the proceeding indicates bad faith, neglect, or a purpose to secure delay itself or some other procedural advantage, the resulting delay is not justified." *Id.*

In *United States v. Jackson,* 7 Cir. 1975, 508 F.2d 1001, the government appealed an order requiring it to disclose its list of witnesses. The Court held that Jackson had not been deprived of a speedy trial. It found that absent bad faith or a sole purpose of delay, "In calculating the length of delay . . . the period of delay attributable to the review of an order appealable under 18 U.S.C. § 3731 [the statute that permits the government to take interlocutory appeals] should not be considered." *Id.* at 1004. "[I]nsofar as appellate review is necessary for the fair administration of 'public justice,' the resulting delay is both unavoidable and justifiable." *Id.* at 1005. *See also United States v. Osuna-Sanchez,* 9 Cir. 1971, 446 F.2d 566, *cert. denied* 1972, 404 U.S. 1022, 92 S.Ct. 693, 30 L.Ed.2d 672. *Cf. United States v. Canales,* 5 Cir. 1978, 573 F.2d 908, 910, holding that the government was justified in awaiting the Supreme Court's decision about the Sarita, Texas, border checkpoint before proceeding in a prosecution involving that checkpoint. *United States v. Martinez-Fuerte,* 1976, 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116. We said in *Canales*: "we cannot fault the government for wanting to await a decision which may have proved dispositive of the issues in the instant case". At 910.

We agree with the general principles expressed by these other Courts of Appeals. An interlocutory appeal by the government is generally a valid reason that justifies an appropriate delay. Of course, when the government acts arbitrarily, negligently, or in bad faith, the delay may not be justifiable. And when, as here, but as in none of the cases we have cited, the defendant is incarcerated because of inability to make bond pending the government's interlocutory appeal, we must analyze the propriety of the appeal more carefully. We must consider at least three factors: the necessity of the appealed question to the government's case, the strength of the government's position on that issue, and the seriousness of the crime. A delay for an appeal on these facts cannot be justifiable if the appeal was about an unimportant or tangential issue or if the government's position was so weak that it should have known it would lose. Moreover, the charged offense must be serious to justify keeping a person presumed innocent in jail a long time before trial pending appeal.

The question the government presented in its interlocutory appeal was an important one. On appeal, the government sought to introduce incriminating statements that Herman had made. These statements, if admitted, would have made the government's case before the jury virtually certain. Without them, the govern-

ment's case on the robbery count, (and on the degree of the murder count) is totally circumstantial. Given this record, we conclude that the issue was of sufficient importance to justify the delay that resulted.

We also find that the government's position on the appealed issue was strong, although it did not prevail. For that first appeal, reported in 544 F.2d at 791, we bypassed the summary procedures available to us and required oral argument. After argument, Judge Goldberg wrote a nine-page opinion, and Judge Gee, while agreeing with the result, added a short concurrence. The government could not have presented this issue on appeal except in an interlocutory fashion. The suppression issue was close enough to merit an appeal, and we hold that the government was justified in bringing its appeal.

The seriousness of the charge also influences us toward the view that the government properly brought an interlocutory appeal against this incarcerated defendant. The right to a speedy trial "is necessarily relative, requiring a balance between the interest of the public in bringing criminals to justice and the interest of the citizen in being free from oppressive and vexatious delay". *United States v. Bishton,* 1972, 150 U.S.App.D.C. 51, 53, 463 F.2d 887, 889 (per curiam). When the crime is serious, the public interest is high. Here, the murder and robbery charges justified delaying the trial of an incarcerated defendant for fifteen months; lesser crimes might not justify so long a delay.

Although delays to seek interlocutory appeals may not be justified in every case, this delay was appropriate. It cannot weigh against the government.

### C.

### Assertion of the right

The third factor we consider in the speedy trial balancing process is Herman's assertion of his right to a speedy trial. At first, Herman did not seek any kind of trial: he pleaded guilty to a lesser offense. After withdrawing his plea, Herman did not quickly press his speedy trial claim: he first indicated that he sought trial on September 16, 1976, about thirteen and one-half months after he was arrested. Although his assertions of the right were strong, they did not occur until the delay was more than half over. *Cf. United States v. Netterville,* 5 Cir. 1977, 553 F.2d 903, 914. And Herman's attorney did not support his pro se motions until a few months before trial. This factor does not favor Herman strongly.

### D.

### Prejudice to the defendant

The final factor that we consider is the degree of prejudice to Herman that arose from the delay. In *Barker,* the Supreme Court recognized three types of prejudice that may result from delay: pre-trial incarceration, anxiety, and impairment of the defense. Herman does not contend that the delay caused an impairment of his defense, the "most serious" of the three types of prejudice. *Barker v. Wingo,* 407 U.S. at 532, 92 S.Ct. 2182, 33 L.Ed.2d at 118. Herman does allege, however, that he was anxious and that his pre-trial incarceration was oppressive. We agree with Herman that his pre-trial incarceration was unfortunate. No one factor, however, controls the balancing process that determines whether a trial has been speedy. *Moore v. Arizona,* 1973, 414 U.S. 25, 94 S.Ct. 188, 38 L.Ed.2d 183.

\*   \*   \*   \*   \*   \*

In sum, we are faced with a serious delay and some prejudice to the defendant, but with a tardy assertion of the right to speedy trial and an excellent justification for the major part of the delay by the government. Balancing all of the relevant factors, we conclude that Herman obtained the speedy trial that the Constitution guarantees him.

The judgment of the district court is AFFIRMED.