**STATE of Minnesota, Respondent,**

v.

**William Warren HELENBOLT,
Appellant.**

**No. C3-80-51556.**

Supreme Court of Minnesota.

June 3, 1983.

C. Paul Jones, State Public Defender, Susan K. Maki, Asst. Public Defender, Minneapolis, for appellant.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, Alan Mitchell, County Atty., Kevin O'Connell, Asst. County Atty., Duluth, for respondent.

SCOTT, Justice.

William Helenbolt was convicted in the St. Louis County District Court in April 1980 of burglary and the first degree murder of Robert Noffsinger. Helenbolt was sentenced to concurrent terms of zero to five years and life imprisonment. Helenbolt appeals from a denial of his motion for a judgment of acquittal, or a new trial, and petition for post-conviction relief. We affirm.

On Monday, January 8, 1979, William Helenbolt and Orville Sunde went to the residence of Robert Noffsinger to pick up a safe. Noffsinger had agreed to sell Sunde a safe and Helenbolt agreed to help Sunde move it. Sunde owned a coin shop and knew Helenbolt, who was a coin collector. After moving the safe from the basement, they took a coffee break to warm up. During the break, Helenbolt asked Noffsinger whether he lived alone and the value of his coin collection.

On Tuesday, January 9, 1979, two friends of Robert Noffsinger were unable to contact him by telephone. On Wednesday,

January 10, 1979, they visited Noffsinger's residence. When they reached the house, they discovered a safe and crowbar at the bottom of an outside stairway. The lights were on inside the house and a window in a basement door was broken out. They looked for Noffsinger, but when they were unable to find him they secured the house. They did not call the police until Thursday, January 11, 1979.

When police officers arrived, they found things as Noffsinger's friends had left them. In addition, the officers found a pile of snow on the north side of the driveway and partially into the yard. Inside this pile, they found Noffsinger's body, a sledge hammer, and a pair of glasses. Officers determined that the sledge hammer had been taken from an area of the garage where hand tools were kept.[1] The police were unable to determine, because of a recent snowfall, the direction of paths in the snow and how many persons made them.

An autopsy was performed on the body of Robert Noffsinger. Bruises were found on the body sufficient to cause unconsciousness. The death was "due to the large skull fracture" caused by a blunt instrument.

Robert Noffsinger was last seen alive the night of Monday, January 8, 1979. Noffsinger attended a 7:30 p.m. band practice at the Shrine Auditorium and left between 9:30 and 10:00 p.m.

Helenbolt had dropped his wife off at a Tupperware party at 7:20 p.m. that same evening. He picked her up at another friend's house at approximately 10:15 p.m. Helenbolt said that he didn't want to stay very long because he was cold and tired. He said that he had taken a couple of people home and become stuck in the snow. He claimed to have shoveled himself out, to explain his condition.

Two witnesses claimed that Helenbolt had contacted Mark Bailey on the day of the crime. Mark Bailey was alleged to be

---

1. No fingerprints were found on the hammer. No other physical evidence was found at the site of the body.

an accomplice of Helenbolt's in the burglary of the Noffsinger residence. Bailey had been separately tried for burglary and murder in the second degree. The murder charge was based upon the felony murder doctrine. Bailey was convicted of burglary and a hung jury resulted on the murder charge. He was sentenced to zero to five years for burglary. Bailey was retried for second degree murder and acquitted.

John Mattila, a friend of Mark Bailey's, claimed that he received a telephone call on Monday, January 8, 1979, at his trailer home from a person who wanted to speak to Mark Bailey. The caller gave his name as Bill. The call was received in the living room, but after Bailey came to the telephone, he decided to take it in the bedroom. Mattila overheard Bailey ask, "How rough is the guy?" and, "How tough is the job?" Bailey said the call was about a job interview and asked Mattila to drop him off in front of a Target store at 7:00 p.m.

JoAnn Hansen, also a friend of Mark Bailey's, testified that on the afternoon of Monday, January 8, 1979, at approximately 3:30 p.m., William Helenbolt came to her house asking for Mark Bailey. He left a business card and asked her to have Bailey get in touch with him by 6:00 p.m. because it was very important.

When Hansen saw Bailey at her home at approximately 6:00 p.m., he said he had talked to Helenbolt. Bailey left with a stocking cap and two pairs of gloves, and returned later to get a roll of tape. Hansen thought she saw him leave in a medium blue truck.

Mark Bailey, who claimed to be an accomplice to the Noffsinger burglary, testified against Helenbolt.[2] Bailey testified that he went with Helenbolt to the Noff-

singer residence on the night of January 8, 1979. He said he was first contacted by Helenbolt at Mattila's trailer on Monday evening, January 8, 1979. Bailey said that Helenbolt told him that he knew where he could make a lot of money. He testified that when Mattila dropped him off for the fictitious interview around 7:00 p.m. Helenbolt was not there, but that he showed up a little after 7:00 p.m. He said that Helenbolt picked him up in a green Ford pickup with an open box. Together, they drove past the Noffsinger residence and noticed lights on in the home. They proceeded to JoAnn Hansen's residence in Superior, Wisconsin, to get some tape which would be used in the event of a confrontation. Upon their return, the lights were out at Noffsinger's. They parked the truck in the parking lot of a nearby Sambo's Restaurant and walked to the house, where Bailey checked to see if there was a car in Noffsinger's garage. Helenbolt tried a glass cutter on a basement door; when it failed to work, they used their forearms to break the window. They were successful and entered the house looking for safes. They then started taking boxes of coins from the basement outside. Neither wore a ski mask; both wore gloves.

Helenbolt and Bailey were at the top of an outside flight of stairs when Noffsinger came home. Noffsinger said, "Stop or I'll shoot." Bailey said that he looked at Noffsinger and ran when he saw that Noffsinger did not have a gun. He saw Helenbolt running in the same direction.

Bailey waited for Helenbolt by the truck in the Sambo's parking lot. Helenbolt returned and said, "It's finished; it's done." Helenbolt said he killed Noffsinger because "he didn't want him to recognize him." Bailey testified that "[h]e said that he had

---

**2.** After Bailey's conviction for burglary, the state attempted to compel Bailey to testify against Helenbolt. Bailey refused, asserting the Fifth Amendment. On March 12, 1979, an order issued at an omnibus hearing refusing to compel Bailey's testimony. On March 15, 1979, the state appealed the order. This court affirmed it June 7, 1979, and denied a petition for rehearing on June 16, 1979. Certiorari was denied by the Supreme Court of the United

States on January 14, 1980. *State v. Helenbolt,* 280 N.W.2d 631 (Minn.1979), *cert. denied,* 444 U.S. 1035, 100 S.Ct. 709, 62 L.Ed.2d 672 (1980).

Subsequently, Bailey was provided with transactional immunity and ordered to testify. Bailey refused and was willing to be cited for contempt of court. Finally, the state agreed to recommend Bailey's release from prison if he would testify before the grand jury and at the trial of Helenbolt.

gotten into a fight with him, and he had knocked him unconscious, then went into the garage—I thought he said a sledge hammer; it turned out he did—and came back and hit him with it." Bailey said that they sat in the truck for awhile and then went back to complete the burglary.

Bailey drove the truck to Noffsinger's and backed it into the driveway. They placed the containers of coins into the box of the truck and drove to a downtown Duluth hotel where Bailey had a room. The coins were unloaded and stored in Bailey's room.

Bailey said he next saw Helenbolt on Tuesday, January 9, 1979, at his room. Bailey had taken the wrappers off the coins and wanted them moved because his probation officer had visited earlier and Bailey was worried that he would return. They took some of the coins to Helenbolt's house and his them under his bed, then took the remainder of the coins to a bank to be exchanged for paper money. They returned to Helenbolt's house to pick up the coins they had left there, then drove separately to Grand Rapids, Minnesota, to sell them to a couple who collected coins. Helenbolt split the proceeds with Bailey.

Helenbolt asked the couple in Grand Rapids if they would hold another box of coins for him. They refused, but suggested that Helenbolt store them at the home of Joyce Steinhart, Helenbolt's sister-in-law, who also lived in Grand Rapids. On January 13, 1979, Joyce Steinhart found two boxes and a suitcase in her basement. The boxes contained coins and had not been there on January 10, 1979, when she was last in the unlocked basement. Steinhart telephoned Helenbolt in Duluth. He told her that he had placed the coins there two weeks earlier. When told by Steinhart that she knew he was lying, Helenbolt said, "It's nothing." He agreed to come and pick up the coins.

Duluth police officer John Hall testified at Helenbolt's trial about his conversations with Bailey after Bailey's arrest in Florida. Bailey said that he could understand being charged with burglary, but couldn't understand being charged with murder when he didn't actually do any killing. Bailey tried to strike a deal and claimed that he could locate certain exculpatory objects of evidence.

Helenbolt did not testify at his own trial, but did volunteer a statement to the police which was admitted into evidence. He said that he did not remember what he did Monday, January 8, 1979, after having dinner with Orville Sunde. Helenbolt stated that he was contacted by Bailey on Tuesday January 9, 1979. He claimed that Bailey had given him some silver coins during the previous week and he paid him $500 for them by check.

Partway through this interview, the police received further information regarding Helenbolt's sale of coins. The interview was changed from a narrative to a question-and-answer format. Helenbolt was given a *Miranda* warning.

Officer Hall indicated to Helenbolt that they had information that he had sold a large number of coins in Grand Rapids. Hall stated that Helenbolt tried to explain that he received some of the coins from Bailey, but his dates did not "correspond or fit."

At the conclusion of Helenbolt's trial, the court instructed the jury on burglary, first degree murder, and the lesser included offense of second degree murder. On April 10, 1980, the jury found Helenbolt guilty of burglary and murder in the first degree. On June 23, 1980, the district court denied Helenbolt's motion for judgment of acquittal or, in the alternative, for a new trial. Helenbolt appeals from this order. Additionally, Helenbolt appeals from the district court's denial of his petition for post-conviction relief on July 9, 1982.

Helenbolt raises seven issues on appeal. Only two warrant discussion.

■ 1. Appellant claims his right to a speedy trial was violated since he spent fourteen months in jail prior to trial.[3] Appellant cites the four factors of *Barker v.*

**3.** Appellant was charged by complaint January 17, 1979 and his trial began March 17, 1980.

*Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), which, if met, require vacation of the conviction. Those factors include, (1) length of delay; (2) reason for the delay; (3) defendant's assertion of his right; and (4) prejudice to the defendant.

■■■ The first factor, the length of the delay, serves two purposes. First, it serves a threshold purpose—there must be a delay long enough to be "presumptively prejudicial." *Barker v. Wingo,* 407 U.S. 514, 530, 92 S.Ct. 2182, 2192, 33 L.Ed.2d 101 (1972). A fourteen month delay, even for a murder charge, is presumptively prejudicial and serves as a "triggering mechanism" to invoke further analysis. *Id.* Second, the length of delay must be weighed along with the other factors.

Appellant emphasizes this second factor, the reasons for the delay. Helenbolt fails to point out that he is responsible for much of the delay. He agreed with his defense counsel to delay his trial until June 11, 1979, because of the need for a Bureau of Criminal Apprehension (BCA) report. Apparently the BCA was on strike during this time and defendant wanted that office to perform tests on the physical evidence found at the scene of the crime. Thus, the length of delay not due to defendant's own actions was nine months. Helenbolt first demanded a speedy trial on July 10, 1979. The delay from July 10, 1979, until January 14, 1980, resulted from the state's decision to appeal a pretrial order refusing to order the testimony of Mark Bailey. The question of the propriety of a delay caused by a pretrial appeal is apparently one of first impression in this state. *See State v. Bekkerus,* 297 N.W.2d 136 (Minn.1980).

■■■ *United States v. Herman,* 576 F.2d 1139 (5th Cir.1978), discussed the issue of whether an interlocutory appeal by the government violated defendant's right to a speedy trial. The court outlined three factors: (1) the necessity of the appealed question to the government's case; (2) the seriousness of the charge facing the defendant; and (3) the strength of the government's position on the issue appealed. We adopt the guidelines of *Herman.* Under these factors, the state's appeal and concomitant delay were justified.

The question presented by the government on appeal was an important one. On appeal, the state sought to compel Bailey's testimony without granting him immunity. Without Bailey's testimony, the state did not have a case against Helenbolt, as the rest of its case was circumstantial. Given this record, we conclude that the issue was of sufficient importance to justify the delay that resulted.

The seriousness of the charge is also an influencing factor. The right to a speedy trial "is necessarily relative, requiring a balance between the interest of the public in bringing criminals to justice and the interest of the citizen in being free from oppressive and vexatious delay." *United States v. Herman,* 576 F.2d at 1147 (quoting *United States v. Bishton,* 463 F.2d 887, 889 (D.C. Cir.1972)). "When the crime is serious, the public interest is high." *Id.* Murder and burglary charges justified delaying the trial of the defendant for eight months; "lesser crimes might not justify so long a delay." *Id.* Here the delay was justified and cannot be weighed against the government.

We also find that there was some strength to the government's position on the appealed issue, although it did not prevail. We refused to grant defendant's motion to dismiss and decided the issue on its merits. We hold the state was justified in bringing its appeal.

■■■ The third consideration was Helenbolt's assertion of his right to a speedy trial. Defendant's first demand for a speedy trial was on July 10, 1979. Subsequently, he sought a writ of prohibition on January 11, 1980. Although Helenbolt's assertions were strong, they did not occur until the delay was almost half over. This factor does not favor appellant.

■■■ The final factor to be considered is the degree of prejudice to Helenbolt that arose from the delay. Helenbolt alleges anxiety and impairment of his defense. We agree that any pretrial incarceration is un-

fortunate. However, Helenbolt's only serious allegation of prejudice is the impairment of his defense by faulty witness memories. An examination of the record indicates that the state was more prejudiced than Helenbolt. Bailey appeared to have the most memory difficulties. Helenbolt's witnesses did not have such difficulties.

In sum, upon balancing all the relevant factors, we conclude that Helenbolt obtained a speedy trial as guaranteed by the constitution. U.S. Const. amend. VI; Minn. Const. art. I, § 6.

2. We also reject appellant's contention that an instruction by the trial court concerning Mark Bailey's prior convictions constituted prejudicial reversible error.

As indicated earlier, the state's major witness, Mark Bailey, had been convicted of burglarizing the Noffsinger residence. He had also been tried twice for second degree felony murder in connection with Noffsinger's death; the first trial resulted in a hung jury, the second in an acquittal. Bailey testified at appellant's trial only in exchange for an early release from the prison term he was then serving on the burglary conviction.

From the very beginning of the trial, Helenbolt's counsel began to lay the groundwork for an attack on Bailey's credibility, based in part upon Bailey's prior murder trials. For example, during *voir dire* Helenbolt's counsel asked a potential juror the following question:

Q. If the prosecutor in this case were to call someone who had been a defendant in a similar case, and then decided to testify, would you take the circumstances under which he chose to testify into consideration in determining the credibility of his testimony?

Similarly, during his opening statement Helenbolt's counsel told the jury that the case turned on Bailey's testimony and that Bailey was not credible. Although he did not specifically mention the prior murder trials, he did stress Bailey's role in the burglary and told the jury to listen carefully to Bailey's testimony as to times and places on the day of the murder.

During its direct examination of Bailey, the state, without objection, elicited testimony that Bailey had been tried twice for second degree murder and that the first trial had resulted in a hung jury and the second in an acquittal. The court sustained an objection to a question by the state which attempted to elicit the state's theory in Bailey's murder trials.

On cross-examination Helenbolt's counsel asked Bailey the following questions:

Q. So you have one burglary, and then you were tried for second degree murder, is that correct?

A. No.

Q. That is incorrect?

A. There were two burglaries.

\* \* \* \* \* \*

Q. You were tried twice on the murder charge, second degree murder charge?

A. Yes.

Q. In fact, you were tried by this very prosecutor, weren't you?

A. Yes, I was.

Helenbolt's counsel would later use this very testimony as part of his attack on Bailey's credibility.

The state later tried to introduce the complaint upon which the murder trials were based, so the jury would know that the state's theory in the prior trials had been that Bailey was guilty of second degree felony murder because it had been reasonably foreseeable that Helenbolt would commit the murder. In the alternative, it requested that the court instruct the jury as to the basis of the prior charges. The state was apparently concerned that if the basis of the prior charges was not explained to the jury, defense counsel would argue that the state had first claimed Bailey killed Noffsinger and that only as a fallback position was the state now accusing appellant of the same offense.

Helenbolt's counsel objected on the ground that such evidence was hearsay and

would deprive him of his right to cross-examine. The court indicated that to avoid any jury confusion about the nature of the prior charges, it would later make a brief statement to the jury as to the exact charge that had been made.

During final argument defense counsel argued that the prior trials on the second degree murder charge detracted from Bailey's credibility:

> Bailey is then tried twice for murder. He is tried twice for murder, and the burglary, once.
>
> From the witness stànd, he hears all of the evidence in this case, and then fashions his story. He has heard the evidence twice, plus John Hall has told him about it, and before he ever testifies, he has all of those factors to use . to fashion his story.
>
> Finally, after the prosecution fails to convict him on the murder charges, and he is sent to jail for burglary, he makes this deal, and it's only then that he opens his mouth and testifies.
>
> \* \* \* \* \* \*
>
> Ladies and gentlemen, William Helenbolt, you have heard, received those coins from Mark Bailey the day after the burglary. There's nothing from any evidence to show anything different unless you believe Mark Bailey, and that's what the state is asking you to base proof beyond a reasonable doubt upon, the words of Mark Bailey; the same Mark Bailey who has been convicted of two burglaries; the same Mark Bailey who had been violated on probation; the same Mark Bailey that this very prosecutor twice tried for murder.
>
> If the prosecutor believes him, if he believed him then, I suggest to you, ladies and gentlemen, there would not be two murder trials.

In these circumstances, neither the introduction of evidence of the two prior murder trials nor the court's instruction can be considered so prejudicial that reversible error was committed.

Helenbolt cannot in any way complain about the introduction of evidence of the prior murder trials. He did not object when the state initially elicited the testimony and, in fact, as part of his trial strategy later re-elicited the same evidence. He again specifically brought out and argued the prior murder trials in his final argument. Where, as a part of his trial strategy, a defendant does not object to and in fact elicits evidence otherwise inadmissible,[4] he cannot on appeal raise his own strategy as a basis for reversal.

It being clear in the circumstances of this case that the introduction of the evidence of the prior murder trials was not reversible error, the question becomes whether the court's brief instruction, viewed in light of the charge as a whole, amounted to prejudicial reversible error.

The instruction, which appellant objected to as embracing matters not in evidence, read as follows:

> Mark Bailey was charged with murder in the second degree of Robert Noffsinger *on the claim that William Helenbolt killed Robert Noffsinger during the burglary; that Mark Bailey was also engaged in the burglary, and that William Helenbolt's actions were reasonably foreseeable to Mark Bailey.* Bailey was convicted of burglary and was acquitted of the charge of second degree murder.

(Emphasis added.) Helenbolt contends that the practical effect of the instruction was to direct a verdict of guilty against the defendant. He claims the clear message in the instruction was that Noffsinger had been murdered, that Bailey and appellant committed the crimes together, and that Bailey had been absolved of the murder. This, it is argued, presented the jury with a process of elimination which foreclosed it from considering that anyone but appellant was responsible for Noffsinger's death.

Clearly, the parts of the instruction not italicized above, stating that Bailey had

4. A plea of guilty, conviction or acquittal of an accomplice or one involved in the crime with the accused is not admissible to prove the guilt or innocence of the accused. *State v. Frese,* 256 Iowa 289, 291, 127 N.W.2d 83, 85 (1964).

been charged with second degree murder and that he was convicted of the burglary and acquitted of the murder, cannot be prejudicial error. This was merely a recitation of facts introduced at trial which neither party disputed and which the defendant himself relied upon as part of his trial strategy.

The critical issue then becomes whether the remaining portion of the instruction, italicized above, which described the prior murder charge, was itself prejudicial reversible error.

It must be remembered that appellant himself brought Bailey's prior murder trials to the jury's attention as a part of his trial strategy to destroy Bailey's credibility. It is not likely that the brief explanation that the prior charge had been for felony murder served to bolster the state's case any more than did the testimony that Bailey had been charged with "second degree murder."

Furthermore, in assessing the potential prejudicial impact of the explanatory language in the instruction, it should be noted that the jury had been told that two prior juries had rejected the state's theory. It is not likely that a theory which the jury knows has been twice rejected by prior juries will add such credibility and believability to the state's case as to require a reversal.

Introduction of the evidence of Bailey's prior trials is no basis for reversal because it was clearly a part of Helenbolt's trial strategy to bring it to the jury's attention. This being clear, the additional three phrases in the instruction explaining the basis of the prior charge against Bailey cannot be considered prejudicial reversible error. The jury's knowledge that Bailey had been acquitted of second degree felony murder rather than "second degree murder" is not so prejudicial as to require a reversal.

We have considered the remaining issues raised by appellant and find them to be without merit.

Affirmed.