STATE of Minnesota, Respondent,

v.

Richard Robert JOHNSON, Appellant,

No. C8–91–2266.

Supreme Court of Minnesota.

March 19, 1993.

Rehearing Denied May 5, 1993.

John M. Stuart, State Public Defender, Lawrence W. Pry, Asst. State Public Defender, St. Paul, and Richard R. Johnson, Stillwater, for appellant.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, and Michael O. Freeman, Hennepin County Atty., J. Michael Richardson, Asst. County Atty., Minneapolis, for respondent.

SIMONETT, Justice.

Defendant-appellant Johnson was convicted, following a jury trial in Hennepin County District Court, of first degree murder in violation of Minn.Stat. § 609.185(2) (1989),[1] and was sentenced to life imprisonment. On appeal, defendant, a Native American, challenges as reversible error the admission of both genetic DNA typing evidence showing a matching genetic profile for a DNA sample taken from his blood and a sample recovered from semen found in the victim's clothing, and related evidence from the FBI showing the statistical frequency with which such a profile would be found in the Caucasian population, as well as claiming a constitutional speedy trial violation. We affirm.

## I.

Defendant Richard Robert Johnson was first arrested for the rape and strangulation of Dorothy Jean Harrison on November 15, 1989, 2 days after the victim's body was discovered in a small clearing in a wooded section of Riverside Park. An autopsy determined that the murder had occurred sometime during the morning of November 11, 1989, that the victim had been strangled, and that, given the large quantity of sperm inside her and the small tear in her vagina, there had been sexual intercourse some 6 to 8 hours prior to her strangulation. The victim's face was covered with bruises and scrapes, her scalp was hemorrhaging, and there were several scissor-like incisions on her chest and abdomen.

Johnson, homeless but employed by a local temporary employment agency, admitted that he often stored clothing and other personal effects, including his green sleeping bag, in the Riverside Park archery range, situated some 300 yards from the clearing where the victim's body was discovered, but denied ever camping in the park. A search of the clearing turned up several items belonging to the defendant, including four check stubs bearing defendant's name and social security number (one stub dated November 10, 1989), and a blue shirt missing three buttons. Defendant's fingerprints were found on some beer cans found strewn about the clearing and on a piece of paper recovered from the victim's purse, which was also found in the clearing. Saliva tests on some Marlboro brand cigarette butts of the brand name smoked by the defendant recovered from the scene showed the presence of blood group factors from someone with Type O blood, as was Johnson. Finally, hairs found on some other clothing found at the scene were determined to correspond to the defendant's hair, and both a green sleeping bag and a pair of scissors were recovered from the site and ultimately linked to defendant.

Almost immediately after his arrest, defendant was interviewed regarding his possible role in the murder of Harrison. In the interview, during which he smoked several Marlboro brand cigarettes, defendant claimed that on November 10th he had worked awhile, picked up his paycheck, then spent the afternoon and evening at his sister's home drinking beer and brandy with both her and her boyfriend. Defendant further told the officer that he had spent the entire night at his sister's apartment and had not left until the next morning, although it was later revealed by his sister's testimony that he had in fact left her home at about 3 a.m. that morning, carrying with him a six-pack of Pabst beer. Apparently, defendant left his sister's after a yelling and shoving episode with her boyfriend, during which defendant lost three buttons from the blue shirt he was wearing. The three buttons were recovered from defendant's sister and later forensically matched to the blue shirt found among defendant's belongings stashed at the murder scene.

Defendant's case did not go to trial until August 9, 1991—some 629 days after he was first arrested. Between the time of his arrest and trial, there were a number of

1. Minn.Stat. § 609.185(2) (1990) provides that whoever "causes the death of a human being while committing or attempting to commit criminal sexual conduct in the first or second degree with force or violence" is guilty of murder in the first degree.

procedural delays occasioned by both state and defense actions. Indisputably, part of the delay was a result of the DNA testing of the defendant's blood and of semen samples taken from the victim's clothing that the state chose to have done by the FBI, which was one of the few testing centers available to the prosecution in this case. Further, before the FBI would perform its testing on the samples, the state had to comply with the FBI's requirement that a preliminary screening first be performed by state laboratories. Thus, because of backlog at the Minnesota Bureau of Criminal Apprehension, in-state preliminary screening alone took some 3 months, and was not completed until February 14, 1990. Only then were the samples sent on to the FBI for more reliable testing, which did not begin until April 30, 1990 due to the extensive waiting list of law enforcement officials nationwide also seeking DNA analysis. The FBI finally finished testing the samples on August 9, 1990.

However, even before the FBI test results were available, the defendant's own actions contributed to the delays in bringing his case to trial. Early on, within a short time after his indictment, defendant requested several continuances and filed a motion to dismiss—both of which delayed his arraignment until June 1, 1990. It was only at that time—some 7 months after his arrest—that defendant first demanded a speedy trial. Upon hearing this demand, the trial court accordingly scheduled a trial for July 30, 1990, within the 60–day time limit required under Minn.R.Crim.P. § 11.-10.

On July 26, 1990, the state made its only request for a continuance, asking for a 2–week delay in order to obtain the final DNA testing results from the FBI. The request was denied, the defendant was released, and the trial court ultimately dismissed the indictment against him on August 3, 1990 for failure to prosecute. On August 6, 1990, the state appealed the trial court's ruling to the court of appeals, which, on September 21, 1990, dismissed the appeal and remanded the matter to the trial court for reconsideration under its recent decision *State v. Stroud*, 459 N.W.2d 332 (Minn.App.1990). The trial court subsequently reinstated the indictment on the basis of *Stroud*, and defendant was rearrested on November 8, 1990, after having been free for more than 3 months.

Thereafter, the bulk of the delays were primarily a result of defense motions. On November 16, 1990, defendant moved for a conditional release, which motion was denied on November 20, 1990. On January 28, defendant requested leave to proceed *pro se*, and demanded an immediate trial. At a February 20, 1991 hearing on these motions, the trial court ordered a Rule 20 evaluation in light of the *pro se* request, and defendant again renewed his speedy trial demand. On March 13, 1991, the trial court granted defendant's motion to appear *pro se*, but appointed standby counsel to assist defendant during the upcoming *Frye* hearing on the admissibility of DNA typing evidence.

On March 19, 1991, defendant moved for suppression of DNA evidence, and a hearing on the motion was held on March 22, 1991 at which the court issued an order for discovery. On April 2, the state was granted its second continuance request—until April 12, 1992. On April 12 and again on April 16, the trial court heard arguments on defendant's other motions to suppress statements and evidence of search and seizure. At this hearing, the trial court granted the state's request for a third continuance until April 22, 1991 in order to secure attendance of a prosecution witness. On April 22, 1991, the suppression hearing ended, and the trial court took the issues under advisement.

On June 4, 1991, the defendant again moved to have the indictment dismissed, which the trial court denied on June 19, 1991. Finally, on June 20, 1991, the *Frye* hearing on defendant's motion to suppress the DNA evidence began, and continued until the court ruling in favor of limited admission of the DNA evidence on August 1, 1991. Meanwhile, the defendant also moved to have the jury sequestered during the trial, which the trial court also granted on August 1, 1991. Eight days after the

*Frye* hearing ended, on August 9, 1991, the trial began.

At trial, defendant, representing himself *pro se*, was the primary witness on his own behalf and was unable to corroborate much of his testimony with other evidence. For example, defendant testified that after leaving his sister's home at 3 a.m. on November 11, he headed over to a friend's residence near the University of Minnesota. Defendant, however, never produced any witnesses other than himself to back up his account, not even the friend who he had supposedly gone to see. In fact, no one else testified as to defendant's whereabouts after leaving his sister's apartment except his sister, who saw him again at about 10 a.m. that morning at a homeless shelter picking up some clean clothes. When she asked where he'd been all night, he told her that after he left her apartment he spent the night simply walking around.

Defendant further claimed at trial that although most of the items retrieved from the crime scene were his, he had not put them there. Defendant instead testified that the items must have been moved from their normal location at the archery range to the crime scene by the actual murderer in order to "frame" him. Yet again, however, defendant was unable to corroborate his testimony in any way, and the jury at trial apparently found defendant's testimony unreliable. Moreover, defendant's own credibility was further impeached by the introduction of evidence as to past criminal record and other questionable behavior, which included a past conviction for first degree assault, heavy alcohol abuse, and a drug addiction.

Finally, the state also introduced evidence that FBI-performed DNA testing on both the defendant's blood and samples of semen taken from the murder victim's clothing were consistent. DNA testing, simply characterized, involves breaking a sample of DNA down into numerous chromosome fragments, and then sorting those fragments into separate categories according to their shape, size, or some other salient characteristic. When fragments from two putatively different samples fit into the same categories, there is a "match." Significantly, such a phenomenon would be quite infrequent among random samples.

As defendant correctly asserted below, however, this evidence does not establish that the two samples are necessarily from the same person, since science has not yet advanced to the point where such a determination is possible. It does, however, at a minimum, indicate that both samples are from a drastically smaller pool of possible contributors. Perhaps more importantly, though, the testing in this case failed to yield a result which would exclude defendant as the possible contributor of the semen, which would have been the effect of testing that failed to result in a "match." Stated differently, had the testing failed to yield a "match," it would likely have exonerated this defendant, in spite of all the other evidence linking him to the crime. Thus, the DNA testing was of potential benefit to both the prosecution and defense here.

In addition to evidence of a profile match between the DNA samples taken from both the suspect and the victim's clothing, the jury also heard evidence relating to the frequency with which one could expect to find such a match among samples taken from given populations. Such statistical evidence is derived from pools of DNA samples taken from hundreds of people, broken down into their component chromosomes, and then sorted for the purpose of determining how often a given size or shape of chromosome is likely to appear in the specified population. This is not evidence proving how often the complete sample of DNA taken from defendant would be "matched" in a population. Rather, it is evidence showing how often certain isolated chromosomes from defendant's DNA sample might appear in a population. Thus, it is more akin to showing how often one might expect to find white picket fences, blue awnings, two-car garages, and French doors on houses in a given neighborhood than showing how often to expect to find a house with all those features in that neighborhood.

The jury here heard evidence relating to the frequency at which three identifiable chromosome particles of defendant's DNA specimen (which "matched" the DNA specimen taken from the semen in the victim's clothing) would be expected to be found in the Caucasian population and the American Indian population, based solely on statistics taken from FBI population databases established for each of those ethnic groups. These statistics showed that each of the individual chromosome particles identified in the defendant's DNA specimen appeared in anywhere from approximately 3 percent to 8 percent of the samples comprising the Caucasian population database, and approximately 7 percent to 27 percent of the samples comprising the American Indian population database. No evidence was presented regarding the frequency with which one might expect to find all three chromosome particles grouped together in the same DNA specimen in either population sample.

## II.

■ The defendant claims that the trial court's decision to admit the DNA typing evidence provided by the FBI was reversible error. The primary thrust of this claim is that the state failed to provide sufficient evidence as to its scientific reliability under the guidelines set forth by this court in *State v. Schwartz*, 447 N.W.2d 422 (Minn.1989). In *Schwartz*, this court reaffirmed our adherence to the traditional *Frye* standard for the admission of emerging scientific evidence, which requires, in short, that experts in the field in question generally agree that the evidence is reliable and trustworthy. *See Frye v. United States*, 293 F. 1013 (D.C.Cir.1923); *State v. Schwartz*, 447 N.W.2d 422, 424 (Minn. 1989). Accordingly, we subsequently found that although DNA typing has gained general acceptance in the scientific community, the admissibility of specific test results hinges on the reliability of those particular results, including (1) the extent to which the testing laboratory complies with appropriate standards and controls, and (2) the availability of the testing data and results to both the defendant and

the scientific community. *Schwartz*, 447 N.W.2d at 426–28.

Here, after nearly 1 month of testimony and at least 12 expert witnesses, the trial court determined that the FBI's testing procedures and laboratory protocol did meet the standards set forth in *Schwartz*. The court determined that the testimony and exhibits presented by the state indicated that the FBI laboratory demonstrates sufficient compliance with the required standards and controls, including compliance with the standards recommended by the Technical Working Group on DNA Analysis Methods (TWGDAM), to ensure the reliability of the testing results in this case. The trial judge's detailed findings and conclusions are amply supported by the record.

This court's recent opinion in *State v. Jobe*, 486 N.W.2d 407 (Minn.1992), lends further support to the trial court ruling. There, we were faced with a similar challenge to the admissibility of FBI-performed DNA testing (done at the very laboratory where the testing in this case occurred), and concluded that "the FBI's DNA RFLP testing procedures met the standards of admissibility set forth by this court." *Id.* at 420. We further held in *Jobe* that although a *Frye* hearing was still required due to the evolving state of this area of science, the "hearing should focus only on whether the laboratory which did the testing was in compliance with the appropriate standards and controls," which are those set out in *Schwartz. Id.* The *Frye* hearing should not devolve into a debate on those standards, nor should it be a "forum for challenging the basic DNA RFLP testing procedures themselves." *Id.* Such arguments should be made at the time of trial, as they go specifically to the weight of the presented results. *Id.*

Accordingly, we hold that the trial court below properly admitted the DNA testing results in this case. Any challenges to the significance of those results or the weight the jury should have accorded them should have been made by defendant during the trial.

## III.

■ Defendant also claims that the trial court improperly admitted statistical frequency evidence based on the FBI's Caucasian database, since the defendant is Native American, and that its admission denied defendant his right to a fair trial. Defendant argues that because the statistics from this database showed that DNA chromosomes matching his own were far less likely to be found among the Caucasian population than the Native American population, there was tremendous potential for the jury to use this information to unfairly and prejudicially conclude that the state had proven statistically that the assailant was a Native American and not a Caucasian.

Defendant's argument fails to persuade us of any prejudicial impact from the introduction of evidence from the FBI's Caucasian database. First, the statistical evidence introduced suggested not that the assailant was definitively a Native American, but that the assailant could have been either a Native American or a Caucasian, as the DNA samples tested could have been matched by individuals from either race. While the statistical evidence presented may have led the jury to believe, properly in this case, that it was more likely than not that the assailant was Native American, it is simply impossible to conclude that the jury would then determine from this evidence that the assailant could not have been Caucasian. The evidence points to exactly the contrary conclusion. Further, it could be equally argued, as the state points out, that introduction of statistical frequency evidence from only the FBI's American Indian database might just as easily lead the jury to conclude that only a Native American could have committed the murder. The populations of Minneapolis and St. Paul are predominately Caucasian—thus the exclusion of frequency evidence from that population could easily have resulted in such an inference.

Second, the use of the Caucasian database was proper here because there was ample evidence that there has been significant admixture between Caucasians and Native Americans in this state. Thus, the use of only the American Indian database would have improperly suggested that it adequately represented all people who are considered Native American, when it in fact did not. Some persons who are considered Native American possess as little as 1/16th Native American blood, and therefore likely would be represented more accurately in the Caucasian database frequency statistics.

Finally, the trial court limited the use of statistical frequency evidence here, as required by this court in *State v. Kim,* 398 N.W.2d 544, 548 (Minn.1987), in order to avoid a "potentially exaggerated impact on the trier of fact" in violation of Minn. R.Evid. 403. Accordingly, the trial court prohibited the state's DNA expert from testifying as to the probability that the semen found in the victim was the defendant's, and even from saying how unlikely it was that it came from someone else. The expert was only allowed to present statistics as to the frequency of the appearance of individual DNA chromosomes matching those found in the samples in the Native American and Caucasian populations. He was not allowed to draw any conclusions from such statistics, nor was he even allowed to speculate as to the frequency with which a DNA sample containing all the distinct chromosomes of this sample might appear in those populations. Thus, the statistical frequency evidence was admitted properly under our ruling in *Kim.*

## IV.

■ The most significant of defendant's claims here is that his right to a speedy trial was violated by the 629-day delay between his first arrest and his trial. While such a delay is clearly troubling on its face, it is important when assessing such a claim to look beyond simply the length of the delay. In fact, as the Supreme Court stated in *Barker v. Wingo,* 407 U.S. 514, 530, 92 S.Ct. 2182, 2192, 33 L.Ed.2d 101 (1972), the length of the delay only serves as a starting point for a speedy trial analysis. Where the delay is presumptively prejudicial, as it certainly is

here given the 60–day time limit for trying a criminal defendant established by this state in Minn.R.Crim.P. 11.10, the court must then look at (1) the reason for the delay, (2) whether the defendant asserted his or her right to a speedy trial, and (3) whether the delay prejudiced the defendant in order to determine whether a speedy trial violation has actually occurred. *Id.* at 530–33, 92 S.Ct. at 2192–94. Only after considering all of these factors can such a determination be made.

Here, the defendant's claim fails under the first of the *Barker* considerations mentioned above, principally because his own motions were the primary reason for much of the delay. The state was directly responsible for only 16 days of the 629–day delay, despite the fact that the DNA test results were obviously unavailable until some 9 months after the defendant's arrest. Prior to the results being available, defense motions resulted in much of the delay, although the prosecution would likely have had to request the additional time anyway if the defendant had not caused the delay himself. After the testing was completed, again the largest portion of the delay was a result of defense motions. The defendant cannot expect this court to allow him to delay his own trial to a point where we find there was a speedy trial violation.

In fact, we have held on numerous occasions that when the overall delay in bringing a case to trial is the result of the defendant's actions, there is no speedy trial violation. *See, e.g., State v. Friberg,* 435 N.W.2d 509 (Minn.1989); *State v. Helenbolt,* 334 N.W.2d 400 (Minn.1983); *State v. Rossbach,* 288 N.W.2d 714, 716 (Minn. 1980). Moreover, delay occasioned by the defendant himself often is deemed a temporary waiver of his speedy trial demand, which can only be revived when the defendant reasserts his speedy trial right. *See, e.g., Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972); *State v. McTague,* 173 Minn. 153, 216 N.W. 787 (1927). Here the defendant did not initially assert such a demand until 7 months after his arrest, and then only reasserted it three times during the following year. Significantly, after all four speedy trial demands, defendant's own actions resulted in significant delays, which itself can be said to have resulted in their waiver.

The fact that the defendant here asserted his speedy trial right four times in nearly 2 years is also significant. A defendant's assertion of such a demand is normally given "strong evidentiary weight" in determining whether or not the right was unfairly denied. *Barker v. Wingo,* 407 U.S. at 531–32, 92 S.Ct. at 2192–93. However, although perhaps frequent, the defendant's speedy trial assertions here cannot be regarded as prompt or forceful, both of which are key to a court's evaluation of a speedy trial claim. *See State v. Friberg,* 435 N.W.2d 509, 515 (Minn.1989); *State v. Jones,* 392 N.W.2d 224, 235 (Minn.1986); *State v. Helenbolt,* 334 N.W.2d 400, 405 (Minn.1983). Defendant's first such assertion took 7 months, and was made only after numerous attempts to have the indictment dismissed, which reflected a tactical decision on his part. Further, his other speedy trial demands were followed by additional defense motions delaying the trial. This factor, therefore, does not favor the defendant.

Finally, although the defendant was incarcerated for most of the time between his arrest and trial, he was responsible for much of the very delay that kept him in jail. Thus, if he was in fact prejudiced by the incarceration, the prejudice was due to his own actions. Also, it cannot be overlooked that defendant was released for more than 3 months at one point, during which time he had opportunity to prepare his defense outside the confines of prison. Defendant also contends that he was prejudiced by his incarceration because of the difficulties of preparing his case *pro se* while in jail. While that is unfortunate, defendant did choose to proceed *pro se* after already spending significant time in jail and presumably therefore appreciating how difficult such a task might be. Thus, although defendant's incarceration might have been unfortunate, the fact that much of the responsibility for that situation was his own weighs against his claim.

Upon balancing all the relevant factors, we conclude that the lengthy delay complained of here was not, in fact, a violation of defendant's speedy trial right as guaranteed by both the sixth amendment of the U.S. Constitution and article I, section six of the Minnesota Constitution. The delay was facially prejudicial, but in light of the reasons for that delay, the relative weakness of defendant's speedy trial demands, and the fact that defendant's ostensibly oppressive and lengthy incarceration was largely due to his own motions delaying the trial, the defendant's claim must fail.

In conclusion, none of the issues raised by defendant's appeal merit reversal of his conviction. The trial court properly admitted results of the FBI's DNA testing and related statistical frequency evidence from both the American Indian and Caucasian databases. Although the delay in trying the defendant was lengthy and should be avoided if possible, his speedy trial claim fails to establish a constitutional violation here, largely because of his shared responsibility for the complained of delays.

Affirmed.

PAGE, J., took no part in the consideration or determination of this case.