**STATE of Minnesota, Respondent,**

v.

**Keith Loren BAUER, Appellant.**

**No. C8-93-1073.**

Court of Appeals of Minnesota.

Feb. 15, 1994.

Review Granted April 19, 1994.

Hubert H. Humphrey, III, Atty. Gen., Mary J. Theisen, Asst. Atty. Gen., St. Paul, and Donald R. Klosterbuer, Rock County Atty., Luverne, for respondent.

John M. Stuart, State Public Defender and Melissa Sheridan, Asst. Public Defender, St. Paul, for appellant.

Considered and decided by NORTON, P.J., and HUSPENI, and FLEMING *, JJ.

## OPINION

NORTON, Judge.

Appellant contends the trial court committed reversible error when it failed to conduct a *Frye* hearing to determine the admissibility of DNA evidence and when it admitted non-statistical opinion testimony at trial regarding matching forensic samples. Appellant failed to request a *Frye* hearing before trial and thereby waived his challenge to the general admissibility of DNA evidence later at trial. The expert testimony met the *Joon Kyu Kim* test and was properly admitted at trial. We affirm.

## FACTS

Appellant Keith Loren Bauer lived with his wife and her two daughters, J.H., age 12, and P.H., age 9, in Beaver Creek, Minnesota. J.H. accused appellant of sexually abusing her during the early morning hours of April 11, 1992.

* Retired judge of the district court, serving as judge of the Minnesota Court of Appeals by ap-

pointment pursuant to Minn. Const. art. VI, § 10.

The facts presented at trial established that by the time appellant arrived home between 3:00 and 3:30 a.m., he had consumed over a case of beer and was extremely intoxicated. At that time, appellant's wife was already awake; she was due at work by 4:00 a.m. Appellant conversed with his wife for a few minutes before she left for work. At the time she left, she knew that her two daughters were upstairs in J.H.'s bedroom, sleeping in the same bed. Appellant testified at trial that after his wife left, he went upstairs to check on the girls, pulled the covers up over P.H. and down over J.H.'s feet, and then left J.H.'s room. He turned off the hallway light and went to his room where he lay down and passed out. Appellant remembers nothing else from that evening. His next memory is waking up the next morning between 10:30 and 11:00 a.m.

The children's testimony established a different set of facts. After his wife left for work, appellant went upstairs into J.H.'s room, took P.H. out of J.H.'s bed and returned her to her own room next door. P.H. said her stepfather had moved her, that she smelled alcohol on his breath, that he was naked when he carried her to her room, and that she recognized a silver necklace around his neck.

When appellant returned to J.H.'s room, he pulled off J.H.'s covers, took off her underwear, and covered her mouth. J.H. saw appellant's face; she recognized him, his voice, and the silver necklace that he was wearing. Appellant attempted to force his penis into J.H.'s vagina, but when it "didn't work" he penetrated her vaginally and rectally with his finger. He then forced her to perform fellatio. He threatened that if she did not cooperate, he would have "regular sex" with her. J.H. felt something very bitter squirt into her mouth; she spit it out onto her pillowcase. During this series of events, P.H. heard J.H. yell. J.H. asked appellant where P.H. and their mother were. Appellant replied that P.H. was in her room and her mother was at work. After appellant left her, J.H. and her sister locked themselves into the downstairs bathroom. They hid there out of fear that their stepfather would come back and try to hurt both of them.

They stayed in the bathroom until approximately 10:30 a.m. when they rode their bicycles to town, telephoned their mother, and told her about what had happened. Their mother picked them up and took them directly to the hospital in Luverne where doctors examined J.H. J.H. gave consistent accounts of the sexual assault to her mother, to the nurse in the emergency room, and to the police detective who investigated the case. In addition, she testified at trial.

A medical examination showed no trauma to the vaginal area, but there was a small blood blister on the side of J.H.'s rectum. The Bureau of Criminal Apprehension (BCA) took blood tests of J.H. and appellant, and a sample of the substance that J.H. had spit from her mouth onto her pillowcase. The BCA subjected this evidence to DNA testing.

Before trial, appellant moved that the court prohibit any mention of probability statistics or nonstatistical opinion evidence regarding DNA. The trial court found that general evidence regarding DNA was admissible, but granted appellant's motion to exclude evidence of statistical probabilities. Mid-trial, immediately prior to the state presenting evidence from the forensic scientist who did the DNA testing, counsel for appellant requested a *Frye* hearing in order to determine whether the methods used by the laboratory were according to protocol. The trial court denied the motion due to counsel's late request, lack of notice of the motion, and lack of preparation to proceed with the hearing. The trial court then allowed the DNA test results into evidence.

After a three-day jury trial, the jury found appellant guilty of six counts of criminal sexual conduct in violation of Minn.Stat. §§ 609.342, subds. 1(a) and 1(h); 609.343, subds. 1(a), 1(g), and 1(h); and 609.345, subd. 1(c) (1992). Appellant moved for a new trial on the basis of a woman's testimony that the victim had recanted her testimony outside of court. The trial court found this evidence insufficient to require a new trial and denied the motion. The trial court then sentenced appellant to an executed term of 91 months in prison, and ordered him to pay $578 in fines and surcharges and $12,643.49 in restitution.

## ISSUES

1. Did the trial court err when it did not conduct a *Frye* hearing on the DNA evidence?

2. Did the trial court err in allowing the forensic expert to testify that the DNA in the semen samples matched appellant's DNA?

## ANALYSIS

### 1. *Frye* Hearing

 Appellant contends the trial court committed reversible error because it failed to conduct a *Frye* hearing on the DNA evidence. We cannot agree.

Minnesota has adopted a test to determine the admissibility of evidence that is generated by emerging scientific techniques. *See Frye v. United States*, 293 F. 1013, 1014 (D.C.Cir.1923).[1] That test simply requires that experts in the field widely share the view that the technique produces results which are scientifically reliable and accurate. *State v. Mack*, 292 N.W.2d 764, 768 (Minn. 1980).

DNA testing is a generally-accepted scientific technique under the *Frye* standard. *State v. Schwartz*, 447 N.W.2d 422, 426 (Minn.1989). Even so, a *Frye* hearing may still be necessary when the state offers DNA evidence because DNA testing is not yet that "routine" and the laboratory standards set out in *Schwartz* are not universally followed. *State v. Nielsen*, 467 N.W.2d 615, 619–20 (Minn.1991); *State v. Alt*, 504 N.W.2d 38, 45 n. 10 (Minn.App.1993), *pet. for rev. granted in part* (on other grounds) *and remanded*, 505 N.W.2d 72 (Minn.1993). DNA test results may be admissible if the tests were conducted according to appropriate laboratory standards and controls to ensure reliability. *Schwartz*, 447 N.W.2d at 426. The *Frye* hearing should focus, therefore, "only on whether the laboratory which did the testing was in compliance with the appropriate stan-

dards and controls" set out in *Schwartz. State v. Jobe*, 486 N.W.2d 407, 420 (Minn. 1992). The hearing should not be a debate over the basic standards or procedures that are followed; any such challenge to those underlying principles goes to the credibility of the evidence and may be raised at trial. *Id.*

This case presents the specific issue of whether appellant's limited motion to exclude only DNA probability and matching evidence constituted a request for a *Frye* hearing. In his pretrial motion, appellant challenged the DNA on limited grounds; appellant moved to prohibit "the state from using probability evidence such as DNA 'matches' it proposes to use in this case." When the court eventually heard this motion, counsel argued that statistical probabilities were not admissible, that "DNA fingerprinting is not yet ready for the courts," and that probability and matching evidence is unreliable, potentially prejudicial, and thus excludable.

Appellant's limited motion to exclude two types of DNA evidence did not constitute a request for a *Frye* hearing, nor did the argument that DNA was too new and unreliable. Neither of these motions sought to evaluate the main inquiry of the *Frye* hearing: whether the laboratory complied with appropriate DNA testing procedures. *Jobe*, 486 N.W.2d at 420.

 Thus, appellant waived the right to attack the general scientific credibility of the DNA evidence at trial when he failed to move to suppress that body of evidence before trial and only challenged it on limited grounds. *See* Minn.R.Crim.P. 8.03, 10.03, 11.03 cmt. ("motions not made upon grounds then known and available to the parties are waived * * * unless the court grants an exception to the waiver."). We find this situation analogous to a *Rasmussen* case wherein the defendant, who failed to attack the evi-

---

1. In a recent decision, the United States Supreme Court decided that the *Frye* test should not be applied in federal trials. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, —— U.S. ——, ——, 113 S.Ct. 2786, 2794, 125 L.Ed.2d 469 (1993). As recently as 1989, however, the Minnesota Supreme Court has reaffirmed the *Frye* test in state cases. *See State v. Schwartz*, 447 N.W.2d 422, 424–25 (Minn.1989). The Minnesota Supreme Court is the proper forum to determine what impact *Daubert* will have upon the *Frye* test in Minnesota state cases. *State v. Alt*, 504 N.W.2d 38, 46 (Minn.App.1993), *pet. for rev. granted in part* (on other grounds) and *remanded*, 505 N.W.2d 72 (Minn.1993).

dence on fourth amendment/illegal seizure grounds before trial, may only object to chain of custody, or other limited issues, at trial; he may no longer object to the evidence as the product of an illegal seizure because he failed to move to suppress the body of evidence before trial.

We note further that when appellant requested a *Frye* hearing mid-trial, appellant was not entitled to it because he had not given notice of the motion for a *Frye* hearing and no defense expert was available to testify. The trial court reasoned that appellant would have the opportunity to object to the DNA expert witness testimony during the course of examination. Such evidentiary decisions rest within the discretion of the trial court. *Colby v. Gibbons*, 276 N.W.2d 170, 175 (Minn.1979). We discern no abuse of that discretion here. The trial court did not err in denying appellant's motion for a *Frye* hearing.

**2. Evidence of a DNA "match"**

■ Appellant alleges the trial court erred when it allowed the forensic expert to testify that DNA in the semen sample taken from J.H.'s pillowcase matched appellant's DNA. We find no error here.

"Nonstatistical opinion evidence" is an expert's interpretation of the scientific evidence presented at trial. In DNA cases, this evidence includes statistical probability evidence (how likely two samples are to match) and the significance of matching samples. *See Alt*, 504 N.W.2d at 52–53. To avoid any exaggerated impact on the trier of fact, Minnesota courts have limited opinion testimony to two points: that the evidence did not exclude the accused as a source of the forensic sample, and that the evidence is consistent with the accused having been the source of the forensic sample. *Id.* at 52 (applying the test set out in *State v. Joon Kyu Kim*, 398 N.W.2d 544, 549 (Minn.1987)). This rule excludes opinion testimony that would interpret the "significance" of the test results in a way that would incriminate the defendant by suggesting that the match is somehow determinative of the defendant's guilt. *See Alt*, 504 N.W.2d at 53.

The forensic expert here presented to the jury each of the autoradiographs from the

DNA testing session. The autoradiographs showed matching bands that signified matching DNA samples. From these readings, the expert concluded that the DNA in the semen samples taken from J.H.'s pillowcase matched the DNA in appellant's blood sample. The expert did not elaborate on that conclusion. The expert's testimony did not suggest that the DNA testing procedure is so accurate that this conclusion verifies appellant's guilt. Nor did she testify to the determinative importance, weight, or significance of the matching samples. Nor did counsel argue such a theory in closing argument. The jury had the ability to determine the "match" independently from their own understanding and review of the evidence of the DNA test results in the autoradiographs. Indeed, the trial court told the jury, "The observation, members of the jury, is up to you whether [the bands] match. [The state] has offered an opinion."

Under these circumstances, the expert's testimony that the DNA from the semen samples matched appellant's DNA was the equivalent of saying that the evidence did not exclude appellant as a "source" of the sample and that the evidence was consistent with appellant being the "source" of the sample under *Joon Kyu Kim*. The expert did not elaborate on the significance of that conclusion with regard to appellant's guilt so as to unduly influence the jury. We hold this testimony permissible under *Joon Kyu Kim*.

■ Even if we were to conclude that the court had erred in allowing that testimony, however, we would consider it harmless error because, aside from the DNA evidence, the record contains substantial evidence to support appellant's conviction. Both girls recognized appellant's face and necklace. The abuser told J.H. where her sister and her mother were when she asked for their whereabouts. J.H. saw appellant's face as he was attacking her. J.H. gave four consistent accounts of the abuse in the course of the police report, investigation, and trial. This evidence alone supports the jury verdict, without regard to the DNA matching evidence.

## DECISION

Appellant waived his challenge to the body of DNA evidence when he moved pretrial to exclude only DNA probability and matching evidence and failed to move pretrial for a *Frye* hearing to evaluate the scientific standards used in the DNA testing. His pretrial motion did not invoke the *Frye* inquiry into the laboratory's testing standards. The trial court did not err in denying appellant's mid-trial motion for a *Frye* hearing. The expert testimony that the DNA in the semen samples matched appellant's DNA was admissible under *Joon Kyu Kim*. The trial court did not err in allowing that testimony at trial. Admission of the DNA evidence in this case did not deprive appellant of a fair trial. In addition to scientific evidence, the record contains sufficient evidence to support the jury's verdict.

**Affirmed.**